UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

             Plaintiff,

                                    Case No.: 2:20-cr-00305-MJH
v.                                 JUDGE MARILYN J. HORAN

HAROLD SOSNA,

             Defendant.

---

## SENTENCING MEMORANDUM

---

## TABLE OF CONTENTS

*I.   PRELIMINARY STATEMENT*..........................................................................................*2*

*II.   DEPARTURE AND VARIANCE BASED UPON A COMBINATION OF FACTORS THAT THE DEFENDANT IS OVER 65 YEARS OLD AND SUFFERS FROM A LITANY OF SERIOUS MEDICAL ISSUES THAT REQUIRE ONGOING TREATMENT.*.....................................................................................................................*6*

(a) Departure and variance Under USSG § 5H1.1-AGE (POLICY STATEMENT) ...................*6*

**Impact of Plea Agreement**..........................................................................................................*6*

**Supervised Release**....................................................................................................................*6*

*III.   THE FACTORS SET FORTH IN 18 U.S.C. § 3553 AS APPLIED IN THIS CASE DO STRONGLY SUPPORT A SUBSTANTIAL VARIANCE.* ..................................................*7*

**Satellite Prison Camp FCI Miami, Florida, RDAP, Self-Surrender**......................................*8*

*IV.   CIVIL COMPLAINT:  S&T BANK VS. ADVANCE MERCHANT SERVICES, ET AL*  *8*

*V.   HAROLD SOSNA'S LIFELONG CHARITABLE DEDICATION TO THE COMMUNITY AND OTHERS* ................................................................................................*9*

*VI.   A SENTENCE WELL BELOW THE GUIDELINES IS SUFFICIENT TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.*...................................*10*

A.  Since Mr. Sosna is Highly Unlikely to Re-Offend, a Substantial Variance Meets the Goals of Specific Deterrence and the Need to Protect the Community.......................................................*10*

B.  A Sentence of Substantial Incarceration Will Not Further General Deterrence.....................*10*

C.  The Advisory Guidelines should be Disregarded Because they Do  Not Reflect an Empirical Approach to Punishment Based on Best Practice and the Calculation Overstates the Severity of the Offense Conduct. ......................................................................................................................*10*

*VII. LEGAL STANDARDS/GUIDELINES*...........................................................................*10*

i

*VIII.*   *CONCLUSION*..............................................................................................................*11*

*ATTACHMENTS*....................................................................................................................*13*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

Plaintiff,

Case No.: 2:20-cr-00305-MJH
v.                                                    JUDGE MARILYN J. HORAN

HAROLD SOSNA,

Defendant.

---

## SENTENCING MEMORANDUM

This memorandum is respectfully submitted on behalf of Harold Sosna as an aid to this Court in arriving at a fair and just sentencing in connection with Mr. Sosna's plea of guilty to a single count of  Bank Fraud.  The sentencing is scheduled for September 21, 2021.

On October 20, 2020, Harold Sosna pleaded guilty before your Honor to a check kiting scheme resulting in a loss in excess of $59 million to S & T Bank.

To Mr. Sosna's significant credit prior to pleading to an information Mr. Sosna sought out legal assistance from the undersigned as well as Alan Statman who is involved with Mr. Sosna's civil litigation with various banks in the Cincinnati area. Upon discussing this matter with counsel Mr. Sosna made the decision to contact the United States AG,  Timothy Mangan, who was the lead prosecutor in the Southern District of Ohio office handling civil and white collar crime type offenses. The Southern District reached out to the Pittsburgh Prosecutor's office specifically, Assistant U.S. Attorney Robert Cessar and Assistant U.S. Attorney Jeffrey Bengel.

This led to an extensive debriefing and proffer with the office of the Assistant U.S. Attorney of the Western District of Pennsylvania.  Mr. Sosna voluntarily submitted himself to the scrutiny and inquires of law-enforcement in the prosecutor's office exposing his crime.

Since that time Mr. Sosna has cooperated with law-enforcement and the Pittsburgh office of the US Attorney and has given voluntary statements to the attorneys for S&T Bank which led to a civil lawsuit captioned *S&T Bank, Inc. vs. Advance Merchant Services, et al*. A copy of the initial pleading (without attachments) is attached as Exhibit A.

It should be noted that Advance Merchant Serves, *et al* are a series of merchant cash advance companies that according to S&T's complaint reaped in excess of $40 million as profit in this ongoing check kiting scheme.

Mr. Sosna did not take the government through a lengthy discovery period., did not plead not guilty and ask for a trial by his peers, but stood before this Court and admitted to an Information outlining his activities and criminal acts.

## I.    PRELIMINARY STATEMENT

Mr. Sosna is a 68-year-old man. Mr. Sosna and his wife, Faye, have been married 42 years, they are the parents of six children, and have six grandchildren. Harold and Faye have built a loving and supportive family and they are very active in attending their grand children's events and activities as they were with their own children's. Mr. Sosna's own parents were survivors of the Holocaust, his mother, Marsha Sosna (nee Goldschleger), physically survived Auschwitz, Majdanek and was mercifully liberated from Treblinka in 1945. She had beaten the physical odds by surviving with her life. She was the only surviving member of her family. However, her mind and soul would never fully recover. She suffered the rest of her life with mental illness, experiencing psychotic breaks and mental breakdowns and ultimately dementia. Mr. Sosna's dad, Jack Sosna, was conscripted into the Soviet military after the Soviet occupation of the Ukraine and served in the front lines during brutal winters and horrifying conditions. Mr. Sosna's parents separately immigrated to Canada, met, married and Harold was born in Montreal in 1953.

Harold suffered horribly from anti-Semitic bullying and beatings as a child. As if that wasn't sufficient abuse, his mother - sick, damaged, and prone to nervous breakdowns - would attack him for imagined transgressions. His father would then come home from an exhausting day of work, hear of his supposedly horrible behavior, and pull off his belt and beat his backside until he sometimes bled. He bears the emotional scars to this day. Fortunately over time, his mother's condition somewhat improved and they moved to a safer neighborhood.

Upon moving to Cincinnati and marrying Faye in 1979, Mr. Sosna became involved with his father in law's nursing home business.   Harold had already worked in a hospital during his college years and was passionate about meeting the needs of residents in their nursing and rehabilitation facilities.  After first working with his father-in-law and then after becoming his partner in some new facilities, Mr. Sosna, struck out on his own in 1998 and formed what later became Premier Health Care Management. He purchased run down and poorly operated facilities and greatly improved the care while investing all the profits into improving the buildings themselves.  Premier became a very respected provider of health care services.  And, as the company grew and its reputation blossomed, the facilities became profitable. For the first time in two generations, the Sosna Family enjoyed financial stability while Mr. Sosna and the great team he had assembled, provided excellent care for residents and rehabilitation patients.  Mr. Sosna was not only responsible for his own family and his employees, but he was responsible for the hundreds of residents' lives that he was privileged to care for. The residents needed staff to care for them; they needed supplies; they needed to be fed. This all required what Mr. Sosna didn't have.  Money. The money pressure was growing daily but Thursdays were the worst.  That was the day payrolls had to be covered.  It always came down to the last minute and the panic inducing stress was intolerable.  He had no cash left. Everything had already been poured into the business.  Mr. Sosna was relentless in his pursuit of business loans.

Every one of the dozens of attempts he made to borrow money from conventional sources was rebuked.  The thought of not being able to pay his hard-working employees was unbearable to a man whose mission was to provide for them.  The enormous weight of the overwhelming responsibilities of caring for his family, patients and staff crushed his ability to reason.  It also exacerbated his depression and anxiety syndrome.  He began to suffer from acute vertigo, dizziness, debilitating tension headaches and balance issues. He turned to alcohol to help alleviate the pressure. Given the different anti-anxiety meds he was on, each one contraindicated for alcohol, the impact of his drinking on his ability to reason was severe.  Mr. Sosna experienced panic attacks and began to make irrational decisions including doing business with merchant cash advance companies ("MCAs") that allowed him to get through a Thursday.  He could cover payroll and buy medical supplies that week.  But this only, caused deeper financial strains and ultimately a financial juggling act that simply could not be maintained.

The impossibility of keeping afloat once the money lenders were involved, with their usury and threatening tactics, caused a kind, honest, generous and trustworthy man, who was literally crushing under such pressures, to make very wrong choices and conduct himself in an egregious manner that left many victims, some in the banking industry, as reflected in the Information and others who had small businesses that depended on the nursing homes to flourish.

Fortunately, the nursing homes have somehow survived and are in the control of receivers who are attempting to either run them or put them back on their feet and sell them in an effort to create some equity to pay back some of the losses others have incurred.

The pressure of the kiting was the last straw.  Mr. Sosna simply could no longer function in this capacity.  Mr. Sosna sought local counsel and began the long road to recovery and redemption,

turning himself in and cooperating in every way with the prosecutors in this case, and offering assistance if needed in other actions of similar nature.

Mr. Sosna knows he must answer for his actions in this case and he fully accepts responsibility for his actions.  Looking back, he sees where he did have other options, the clarity of hindsight and under his current medical supervision, verses being in the thick of it, and being afraid and fearful for his family and his own life.  Mr. Sosna was under great stress and made bad decisions.

Under his current medical providers and with compliance to his prescribed and ongoing treatments, Mr. Sosna is no longer desperate, rather he is relieved, and he and his family believe that had his mental health been sound, he would not be here today.  It is Mr. Sosna's passionate desire to somehow make good out of this and hopes to one day provide counsel and the possibility to others who wish to go into the business world, especially those who have criminal records which make them virtually unemployable.

He has already started down this path.  He has volunteered for a non-profit company, Prison Professors, whose mission is to help those incarcerated prepare for life after prison. They offer numerous courses and resources with the sole aim of providing the skills necessary to successfully navigate their future. He also is taking advantage of his many years of operating a successful company in an industry fraught with bad players to start a website offering mentorship to those who might need some guidance.  Mr. Sosna operated for forty years in the healthcare industry without even a whiff of any wrongdoing.  This was a man who had an impeccable record and an outstanding reputation. At one point in the recent past, every single one of his facilities were rated five stars by CMS.  Mr. Sosna's mom and dad survived governments that only knew unbelievable cruelty and death.  Mr. Sosna became a naturalized U.S. Citizen, a day he says rivals the birth of his children and finds himself at the mercy of its government.

Mr. Sosna wishes to have the most lenient discretion applied at sentencing in order to permit him to begin the restitution processes.  He has already been offered gainful employment through Prison Professors, once his sentence is complete.

Mr. Sosna is currently under the care of several medical treaters:  He is treated for Type II Diabetes, Anxiety, Alcohol and Anti-Anxiety medication abuse.  His current treating physician, Dr. Magenheim, has offered his professional medical opinion as to the risks Mr. Sosna faces while incarcerated.  Mr. Sosna has been engaged in counseling services at IKRON since December 29, 2020.  Attachments Exhibit B and Exhibit C.

## II.   DEPARTURE AND VARIANCE BASED UPON A COMBINATION OF FACTORS THAT THE DEFENDANT IS OVER 65 YEARS OLD AND SUFFERS FROM A LITANY OF SERIOUS MEDICAL ISSUES THAT REQUIRE ONGOING TREATMENT.

(a) Departure and variance Under USSG § 5H1.1-AGE (POLICY STATEMENT)

The Probation Department states that Mr. Sosna's applicable Guidelines range is 63 to 78 months' imprisonment.  (PSR pages 19, paragraph 77)

Statutory Provisions:  The Maximum term of imprisonment is 30 years. 18 U.S.C. § 1344(1).

Guideline Provisions, based upon a total offense level of 26 and a criminal history category of I, the guideline imprisonment range is 63-78 months.

### Impact of Plea Agreement

The Plea Agreement accounts for the defendant's offence conduct in the instant case.

### Supervised Release

Statutory Provisions:  The Court may impose a term of supervised release of not more than 5 years. 18 U.S.C. § 3583(b)(1).

Guideline Provisions:  Since the offense is a Class B Felony, the guideline range for a term of supervised release is 2 years to 5 years. USSG § 5D1.2(a)(1).

Based upon Mr. Sosna's advanced age and health conditions and his exemplary behavior while awaiting sentencing, his family's support, his willingness to immediately and capably begin the restitution process, and the absence of any criminal history before this instant matter,  Mr. Sosna asks for a sentence below his guideline range of 63 to 78 months.

### III.     THE FACTORS SET FORTH IN 18 U.S.C. § 3553 AS APPLIED IN THIS CASE DO STRONGLY SUPPORT A SUBSTANTIAL VARIANCE.

Mr. Sosna fits within the generally accepted category as elderly according to the above-cited publication by the Department of Justice, he also suffers from a number of ailments that likely cannot be adequately addressed by BOP facilities.  Particularly, when one considers his criminal history category zero, it makes no financial sense to engage all the processes and personnel to incarcerate Mr. Sosna in the BOP, have him classified, transported, and have all of his medications and medical needs met, when there are less restrictive alternatives that can be imposed that still reflect the serious ness of the crime and provide a sentence that is not greater than necessary to satisfy the goals of sentencing under 18 USC 3553.

In *U.S. v. McFarlin*, 535F 3d 808 (8 Cir. 2008) a 54-year old Defendant with anxiety, depression, heart disease and nervous disorders was given three years' probation rather than a 60-month guideline term for conspiracy to distribute cocaine.

As described above, Mr. Sosna suffers from more serious ailments than the Defendant in *McFarlin* and committed a crime far less serious.

Mr. Sosna is currently under the care of several medical doctors for numerous medical conditions:  He is treated for Type II Diabetes, Anxiety, Alcohol and Anti-Anxiety medication abuse. Douglas A. Magenheim, M.D. MBA, FAC, has offered his professional medical opinion as to the

risks Mr. Sosna faces while incarcerated.  It is clear that Dr. Magenheim is concerned that Mr. Sosna

will not be safe in a prison environment, and all of his medical necessities will not be met.  Dr.

Magenheim is concerned about a Mr. Sosna's potential for decline and believes the risks to Mr.

Sosna's health with the

> "Covid-19 pandemic and in congregant living situations a move to that type
> of living situation would increase his risk of poor outcome…" [1]

### **Satellite Prison Camp FCI Miami, Florida, RDAP, Self-Surrender**

If incarcerated, Mr. Sosna humbly and respectfully requests incarceration at Satellite Prison

Camp at FCI Miami, Florida.  This facility is located near his wife Faye Sosna's home and their son

Robbie Sosna's home in Aventura.  This facility has an RDAP program, and if placed there, Mr.

Sosna could continue his treatment for substance abuse.  Mr. Sosna humbly asks this Honorable

Court to permit Mr. Sosna to self-surrender at the Miami Satellite Prison Camp at FCI Miami.

### IV.     CIVIL COMPLAINT:  *S&T BANK VS. ADVANCE MERCHANT SERVICES, ET AL*

The following is a quote from victim bank S&T Bank's civil lawsuit. The source of the

complaint is Defendant, Harold Sosna's proffer to the federal government.  *S&T Bank vs. Advance*

*Merchant Services, et al* Case No. A 2102471, Hamilton County Common Pleas Court, Hamilton

County, Ohio.  (Copy of Initial Pleading (Complaint) (without attachments) attached as Exhibit B):

> "Mr. Sosna has pled guilty to federal crimes and will likely forfeit his assets
> and spend years in federal prison. Harold Sosna has also had a judgment entered
> against him as a result of his conduct related to S&T. The Defendants, on the other
> hand, extracted almost $78 million in just a few months through the scheme, most of
> which was stolen from S&T, and have retained a profit of over $43 million from the
> scheme they financed and encouraged.
>
> Through this lawsuit, S&T Bank seeks to recover its loss from Defendants,
> who promoted, advanced, and materially profited from the check-kiting scheme that
> caused that loss."

---

[1] Letter from  Douglas A. Magenheim, MD., MBA, FACP attached as Exhibit B)

It should be noted that the above extraction is a verbatim summary of the proffer that Mr. Sosna gave the victim S&T Bank and their lawyers in an effort to give them enough information to file the lawsuit against the MCA's and in time recapture the approximately $40 million that are claimed to have been taken by the MCAs.

This Honorable Court will likely receive numerous victim impact statements.   It is respectfully requested that the Court keep in mind the lawsuit that was filed by the primary victim *S&T Bank vs. Advance Merchant Services, et al* (Exhibit B).

Based on the above it is respectfully submitted that the Court can consider a departure from the guidelines sentencing recommended by the Probation Department and the U.S. Government.

## V.    HAROLD SOSNA'S LIFELONG CHARITABLE DEDICATION TO THE COMMUNITY AND OTHERS

The Sosna Family shared its success in the community. The family was admired and respected. Mr. Sosna contributed very big-heartedly to numerous charitable causes and his generosity to the community extended to the hundreds of employees at the nursing facilities.  It was not a secret that employees who had fallen upon hard times would find out that Harold had stepped in and financially helped them, never seeking repayment.  Mr. Sosna paid his employees well - well above the industry averages, recognizing the need to pay people a living wage. Despite that, from time to time, individual employees found themselves in impossible financial situations. They couldn't pay their rent or buy food or clothes for their children because their ex-husbands refused to pay their child support. Or their cars broke down and they couldn't afford the cost of the repairs. Whatever the issue, Mr. Sosna was always there for his employees.  He paid for a new set of teeth for a former meth addict, he helped pay off a mortgage for a valued employee that was being threatened with foreclosure.   He was a good and generous employer that loved and was loved by his employees. It is a rare company that treats its hundreds of employees like family, and almost

unheard of for an employer to pay for employee's family members funerals.  Harold, having known

hardship, was a believer and doer of pay it forward.  He felt an overwhelming sense of responsibility

to take care of those who worked for him.

**VI.    A SENTENCE WELL BELOW THE GUIDELINES IS SUFFICIENT TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.**

A.  Since Mr. Sosna is Highly Unlikely to Re-Offend, a Substantial Variance Meets the Goals of Specific Deterrence and the Need to Protect the Community.

B.  A Sentence of Substantial Incarceration Will Not Further General Deterrence.

C.  The Advisory Guidelines should be Disregarded Because they Do  Not Reflect an Empirical Approach to Punishment Based on Best Practice and the Calculation Overstates the Severity of the Offense Conduct.

**VII.   LEGAL STANDARDS/GUIDELINES**

Federal courts refer to guideline sentencing and have broad discretion when imposing

sentences.  In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that

it may be "fair to assume" that the guidelines "reflect a rough approximation " of sentences that

"might achieve § 3553(a)'s objectives.  In this case the objective should be to insist on and

accomplish restitution to the victims.  This objective cannot be achieved while incarcerated.  Mr.

Sosna has been on home arrest/bond for the past 14.5 months.  We ask this Honorable Court to

exercise its discretion in sentencing limiting Mr. Sosna to a period of incarceration and then to house

arrest and doctor visits but also permitting him to begin making the victims whole.  Mr. Sosna does

not have any opportunity to make restitution if incarcerated for an extended time, given his advanced

age and medical conditions.

## VIII.   CONCLUSION

Consideration of the Section 3553(a) factors indicate that a sentence well below the guidelines range is appropriate.  It is submitted on Mr. Sosna's behalf and his family's behalf in light of Section 3553(a) that these factors militate in favor of a sentence well below the guidelines range.

First the Court is required to consider the nature of circumstances of the offence and the history and characteristics of defendant.  Here the Court should take account of the fact that Mr. Sosna has no prior criminal convictions and as discussed earlier, has demonstrated acceptance of responsibility due to self-reporting, admitting his conduct, admitting his conduct to his victims, meeting with attorneys for the banks and in an effort to help them recoup the money and by his continuing cooperation with law enforcement in all of their efforts to make sure all those responsible are held accountable.  Mr. Sosna took a great deal of money, and the bottom line is that two-thirds of the money went into the hands of the Merchant Cash Advance people.

It is therefore respectfully submitted that Mr. Sosna receive a sentence well below the guidelines range of 63 to 78 months.

Respectfully submitted,

*/s/ Herbert J.  Haas*
HERBERT J. HAAS (#15411)
Attorney for Defendant
HAAS & HAAS LAW, LLC
114 East Eighth Street
Cincinnati, Ohio 45202
Phone: (513) 721-1126, Fax: (513) 621-2525
Herb@HaasandHaasLaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed on the 10th day of August 2021, the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Assistant U.S. Attorney.

*s/ Herbert J.  Haas*
Herbert J. Haas (#15411)

**ATTACHMENTS**

**Exhibit A**   Copy of Initial Pleading (without attachments) of S&T Bank vs. Advance Merchant Services, et al Case No. A 2102471, Hamilton County Common Pleas Court, Hamilton County, Ohio.

**Exhibit B**   Letter of August 3, 2021, from Douglas A. Magenheim, MD, MBA, FACP

**Exhibit C**   Letter of August 10, 2021, from Rachel Eklund, MA, LPC.

<span style="color:red">EXHIBIT A</span>



# AFTAB PUREVAL
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
July 19, 2021 06:11 PM
    AFTAB PUREVAL
   Clerk of Courts
Hamilton County, Ohio
CONFIRMATION 1089461
```

**S&T BANK**                                    **A 2102471**

**vs.**

**ADVANCE MERCHANT
SERVICES**

# FILING TYPE:  INITIAL FILING (OUT OF COUNTY) WITH NO JURY DEMAND

## PAGES FILED: 90



VERIFY RECORD

EFR200

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| S&T BANK, INC.<br>491 North Cleveland Massillon Road<br>Akron, Ohio 44333 | )<br>)<br>) | CASE NO.<br><br>JUDGE |
| | ) | |
|        Plaintiff, | ) | |
| | ) | |
|   vs. | ) | COMPLAINT |
| | ) | |
| ADVANCE MERCHANT SERVICES,<br>6440 Southpoint Parkway, Suite 140<br>Jacksonville, Florida 32216 | )<br>)<br>) | |
| | ) | |
| YELLOWSTONE CAPITAL LLC,<br>1 Evertrust Plaza<br>Jersey City, New Jersey 07302 | )<br>)<br>) | |
| | ) | |
| GREEN CAPITAL FUNDING,<br>c/o Business Filings Inc., Stat Agent<br>187 Wolf Road, Suite 101<br>Albany, New York 12205 | )<br>)<br>)<br>) | |
| | ) | |
| HIGH SPEED CAPITAL, LLC,<br>116 Nassau Street, Suite 804<br>New York, New York 10038 | )<br>)<br>) | |
| | ) | |
| IOU FINANCIAL INC.,<br>600 TownPark Lane, Suite 100<br>Kennesaw, GA 30144 | )<br>)<br>) | |
| | ) | |
| EVEREST BUSINESS FUNDING, LLC,<br>8200 NW 52nd Terrace, 2nd Floor<br>Doral, Florida 33166 | )<br>)<br>) | |
| | ) | |
|       and | ) | |
| | ) | |
| 5 West 37th Street, Suite 1100<br>New York, New York 10018 | )<br>) | |

1

KNIGHT CAPITAL FUNDING LLC,          )
110 SE 6th Street                    )
Fort Lauderdale, Florida 33316       )
                                     )
RAPID FINANCIAL SERVICES, LLC,       )
4500 East West Highway, 6th Floor    )
Bethesda, Maryland 20814             )
                                     )
PEARL CAPITAL BUSINESS FUNDING       )
LLC,                                 )
C/O CORPORATION SERVICE              )
COMPANY                              )
80 State Street                      )
Albany, New York 12207               )
                                     )
ONEFUNDER INC.,                      )
8019 N Himes Avenue                  )
Tampa, Florida 33614                 )
                                     )
ROC FUNDING GROUP LLC,               )
1457 Richmond Road                   )
Staten Island, New York 10304        )
                                     )
MAIN STREET FINANCE GROUP, LLC,      )
2801 Northeast 183rd Street, 504W    )
Aventura, Florida 33160              )
                                     )
KASH CAPITAL LLC,                    )
356 Gerald Circle                    )
Milpitas, California 95035           )
                                     )
ADDY SOURCE LLC,                     )
101 Chase Avenue, Suite 202          )
Lakewood, New Jersey 08701           )
                                     )
         and                         )
                                     )
211 Boulevard of the Americas, Suite 205  )
Lakewood, NJ 08701                   )
                                     )
REGION CAPITAL LLC,                  )
101 Chase Avenue, Suite 101          )
Lakewood, NJ 08701                   )
                                     )

2

YES CAPITAL GROUP LLC,                      )
161 Kings Highway                           )
Brooklyn, New York 11204                    )
                                            )
REGAL CAPITAL GROUP INC.,                   )
319 Bridgeport Road E                       )
Waterloo, Ontario N2J 2K9                   )
Canada                                      )
                                            )
OASIS FUNDING NETWORK LLC,                  )
4723 West Atlantic Avenue, Suite 3          )
Delray Beach, Florida 33445                 )
                                            )
SPG ADVANCE LLC,                            )
5306 New Utrecht Avenue                     )
Brooklyn, New York 11219                    )
                                            )
BMF CAPITAL LLC,                            )
1820 Avenue M, Suite 125                    )
Brooklyn, New York 11230                    )
                                            )
EIN CAP, INC.,                              )
160 Pearl Street, Floor 5                   )
New York, New York 10005                    )
                                            )
LIFETIME FUNDING LLC,                       )
6325 Saunders Street, Apartment 3E          )
Rego Park, New York 11374                   )
                                            )
LRM CAPITAL LLC,                            )
d/b/a LRM CAPITAL HOLDINGS LLC              )
48 Wall Street, 5th Floor                   )
New York, New York 10005                    )
                                            )
WG CAPITAL USA INC.,                        )
16004 46th Avenue                           )
Flushing, New York 11358                    )
PROSPERUM CAPITAL LLC,                      )
8 W 36th Street, Floor 7                    )
New York, New York 10018                    )
                                            )
REACT FUNDING,                              )
300 W Grand Avenue, Suite 100B              )
Escondido, California 92025                 )

3

CAPCALL, LLC,                                      )
122 E 42nd Street, Room 2112                       )
New York, New York 10168                           )
                                                   )
BFS CAPITAL, INC.,                                 )
3301 N University Drive, Suite 300                 )
Coral Springs, Florida 33065                       )
                                                   )
APEX CAPITAL SOLUTIONS LLC,                        )
247 Cayuga Road, Suite 5E                          )
Cheektowaga, New York 14225                        )
                                                   )
LLSV CORP.,                                        )
50 Old Field Lane                                  )
Great Neck, New York 11020                         )
                                                   )
DIESEL FUNDING GROUP LLC,                          )
663 NE 167th Street, Suite 831                     )
Miami, Florida 33162                               )
                                                   )
MERCHANT CAPITAL SOLUTIONS LLC,                    )
147 W 35th Street, Suite 805                       )
New York, New York 10001                           )
                                                   )
60 DAY CAPITAL LLC,                                )
175 Great Neck Road, Suite 206                     )
Great Neck, New York 11021                         )
                                                   )
YRB MCA INC.,                                      )
1274 49th Street, Suite 197                        )
Brooklyn, New York 11219                           )
                                                   )
24 CAPITAL,                                        )
20200 W Dixie Hwy, Suite 908                       )
Miami, Florida  33180                              )
                                                   )
AVANZA CAPITAL,                                    )
47 Craig Avenue                                    )
Staten Island, New York 10307                      )
                                                   )
BAYPOINT FUNDING,                                  )
1979 Marcus Ave North New Hyde Park                )
Long Island, New York 11042                        )

4

DIRECT CASH GROUP, INC.,                        )
1908 Coney Island Avenue                        )
Brooklyn, New York  11230                       )
                                                )
EOM ADVANCE LLC,                                )
160 Pearl Street, 5th Floor                     )
New York, NY 10005                              )
                                                )
FUNDRY CAPITAL,                                 )
1 Evertrust Plaza                               )
Jersey City, New Jersey  07302                  )
                                                )
GREEN FUND NY,                                  )
461 Van Brunt Street                            )
Brooklyn, New York  11231                       )
                                                )
HIFI FUNDING,                                   )
90 Broad Street                                 )
New York, NY 10004                              )
                                                )
QUEEN FUNDING LLC,                              )
101 Chase Avenue, Suite 208                     )
Lakewood, New Jersey  08701                     )
                                                )
RAPID CAPITAL INC.,                             )
14712 75 Avenue                                 )
Flushing, New York  11367                       )
                                                )
REGIS CAPITAL GROUP LLC,                        )
323 Sunny Isles Blvd., Suite PH                 )
Sunny Isles Beach, Florida  33160               )
                                                )
WORLDWIDE CAPITAL MANAGEMENT,                   )
INC.                                            )
7545 Irvine Center Drive # 200                  )
Irvine, California  92618                       )
                                                )
JOHN DOE MCA ENTITIES 1 – 8,                    )
Whose Real Name & Identity                      )
Cannot Be Ascertained At This Time              )
                                                )
            Defendants.                         )

5

## SUMMARY OF ACTION

1.     This case involves the fallout from a massive check-kiting scheme perpetrated by Harold J. Sosna ("Sosna") and enabled by Defendants that left Plaintiff S&T Bank, Inc. ("S&T") with nearly $60 million in losses and Defendants with over $43 million in ill-gotten gains.

2.     Defendants are a group of interrelated merchant cash advance ("MCA") businesses, who offer short-term financing at incredibly high interest rates to the most desperate borrowers. These companies skirt state usury laws governing interest rates in lending by technically purchasing a company's future "receivables," instead of providing an outright loan, which would be illegal at the effective interest rates they charge.

3.     Sosna ran a group of assisted living facilities in Ohio and his operations were on the verge of financial collapse by late 2018.

4.     Then, Defendants stepped in at just the right time promising to float his operations, but only at inconceivable rates of return for themselves – nearly all of those rates equate to over 300% interest on an annualized basis.  Once Sosna started to work with one MCA, others came out of the woodwork offering more financing at even higher rates, and it was clear that the MCAs shared common ownership, control and information about targets like Sosna, because these newcomers already knew confidential details of Sosna's finances.

6

5.     Moreover, as part of the financing process, the MCAs demanded absolute access to and control of all of Sosna's financial accounts.  The MCAs employed predatory practices to extract any and all assets out of Sosna's assisted living facilities.

6.     In an effort to fund operations and repay the MCAs, in late 2019, Sosna began kiting checks at various traditional banks, including Plaintiff.

7.     As described in more detail herein, Defendants worked in concert to assist, advance, and support Sosna's check kiting scheme so that they could enrich themselves with stolen bank funds generated by the kite under the guise of non-traditional financing.

8.     Indeed, the MCAs had to know that Sosna was kiting checks because they had complete access to all of his financial accounts at every financial institution and could see the kiting transactions between institutions in real time.  As experts in purchasing receivables, the MCAs knew that the sharp increase in purported income to Sosna's accounts was fraudulent. However, instead of ceasing their relationship with Sosna, the MCAs instead increased their efforts to deploy even more capital to Sosna and actually encouraged him to continue the kiting scheme.

9.     Indeed, Defendants continued to provide funding to fund Sosna's kiting scheme, knowing that the funds they were directly withdrawing from his accounts were stolen.

10.     When the dust settled, Defendants reaped substantial financial windfall directly resulting from the massive fraud.  S&T lost almost $60 million, among losses by other lenders. Harold Sosna has pled guilty to federal crimes and will likely forfeit his assets and spend years in federal prison.  Harold Sosna has also had a judgment entered against him as a result of his conduct related to S&T.  The Defendants, on the other hand, extracted almost $78 million in just a few months through the scheme, most of which was stolen from S&T, and have retained a profit of over $43 million from the scheme they financed and encouraged.

11.     Through this lawsuit, S&T seeks to recover its loss from Defendants, who promoted, advanced, and materially profited from the check-kiting scheme that caused that loss.

### JURISDICTION AND VENUE

12.     Defendants expressly and intentionally aimed their conduct and substantial business activities at the forum state, and many of the acts, occurrences, and/or transactions alleged in this Complaint occurred in the forum state and in this district.

13.     The Court has personal jurisdiction over Defendants specific to this action as their conduct was expressly and intentionally aimed at the forum state, as described more fully below.

14.     Hamilton County is the proper venue because the Defendants directed their activity in this county that gave rise to the claims asserted herein.

### THE PARTIES

15.     Plaintiff S&T is a Pennsylvania corporation licensed to conduct business in the State of Ohio and headquartered in Indiana, Pennsylvania.

16.     Defendant Advance Merchant Services ("Advance Merchant Svcs") is an MCA provider that offers non-traditional small business financing at oppressive interest rates.  Upon information and belief Advance Merchant Svcs is headquartered in Jacksonville, Florida.

17.     Defendant Yellowstone Capital LLC ("Yellowstone") is an MCA provider organized as a limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.  Yellowstone is also the parent company for a number of MCAs, including but not limited to Green Capital, High Speed Capital, West Coast Business Capital, LLC, World Global Capital LLC, Thryve Capital Funding LLC, and Mason Capital LLC.

18.     Defendant Fundry, LLC ("Fundry") is an MCA provider organized as a limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.  Defendant Yellowstone now operates as Fundry.

19.     Defendant Green Capital Funding, LLC ("Green Capital") is an MCA provider organized as a limited liability company in New York that offers non-traditional small business financing at oppressive interest rates and was party to several agreements dated in March and April 2020 with Sosna and some of his entities.

20.     Defendant High Speed Capital, LLC ("High Speed Capital") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated January 31, 2020 with Sosna and some of his entities.

21.     Defendant IOU Financial Inc. ("IOU") is an MCA provider organized as a corporation in Delaware that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated February 22, 2019 with Sosna and some of his entities.

22.     Defendant Everest Business Funding, LLC ("Everest Business Funding") and also doing business as EBF Holdings, LLC is an MCA provider organized as a foreign limited liability company in Delaware that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated November 14, 2019 with Sosna and some of his entities.

23.     Defendant Knight Capital Funding LLC ("Knight Capital Funding") is an MCA provider organized as a foreign limited liability company in Delaware that offers non-traditional

small business financing at oppressive interest rates and was party to at least one agreement dated October 21, 2019 with Sosna and some of his entities.

24.     Defendant Rapid Financial Services, LLC ("RapidAdvance"), formerly doing business as RapidAdvance, is an MCA provider organized as a foreign limited liability company in Delaware that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated July 30, 2019 with Sosna and some of his entities.

25.     Defendant Pearl Capital Business Funding, LLC ("Pearl") is an MCA provider organized as a foreign limited liability company in Delaware that offers non-traditional small business financing at oppressive interest rates.

26.     Defendant OneFunder Inc. ("OneFunder") is an MCA provider organized as an S corporation in Florida that offers non-traditional small business financing at oppressive interest rates.

27.     Defendant ROC Funding Group, LLC ("ROC Funding") is an MCA provider organized as a foreign limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

28.     Defendant Direct Cash Group, Inc. ("Direct Cash Group") and also doing business as Direct Cash Group 1 and Direct Cash Group is an MCA provider organized as a domestic business corporation in New York that offers non-traditional small business financing at oppressive interest rates.

29.     Defendant Kash Capital LLC ("Kash Capital") is an MCA provider organized as a domestic limited liability company in California that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated April 28, 2020 with Sosna and some of his entities.

10

30.     Defendant Addy Source LLC ("Addy Source") is an MCA provider organized as a foreign limited liability company in New Jersey that offers non-traditional small business financing at oppressive interest rates.

31.     Defendant EIN Cap, Inc. ("EIN Cap") is an MCA provider organized as a domestic business corporation in New York that offers non-traditional small business financing at oppressive interest rates.

32.     Defendant Region Capital LLC ("Region Capital") is an MCA provider organized as a domestic limited liability company in Florida that offers non-traditional small business financing at oppressive interest rates.

33.     Defendant Yes Capital Group LLC ("Yes Capital") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

34.     Defendant Baypoint Funding ("Baypoint Funding") is an MCA provider located in New York that, upon information and belief, is not a duly registered or organized corporate entity, but that offers non-traditional small business financing at oppressive interest rates.

35.     Defendant Regis Capital ("Regis Capital") is an MCA provider organized as a domestic limited liability company in Florida that offers non-traditional small business financing at oppressive interest rates.

36.     Defendant Avanza Capital LLC ("Avanza") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated March 25, 2020 with Sosna and some of his entities.

11

37.     Defendant Queen Funding ("Queen Funding") is an MCA provider organized as a domestic limited liability company in New Jersey that offers non-traditional small business financing at oppressive interest rates.

38.     Defendant Regal Capital Group LLC ("Regal Capital") and also doing business as Regal Capital Group Inc. is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

39.     Defendant Oasis Funding Network LLC ("Oasis Funding - JLEAK") and also doing business as Oasis Funding - JLEAK is an MCA provider organized as a domestic limited liability company in Florida that offers non-traditional small business financing at oppressive interest rates.

40.     Defendant SPG Advance LLC ("SPG Advance") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

41.     Defendant BMF Capital LLC ("BMF Capital") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

42.     Defendant Lifetime Funding LLC ("Lifetime Funding") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

43.     Defendant 24 Capital ("24 Capital") is an MCA provider in New York that, upon information and belief, is not a duly registered or organized corporate entity, but that offers non-traditional small business financing at oppressive interest rates.

44.     Defendant LRM Capital LLC ("LRM") and also doing business as LRM Capital Holdings LLC is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

45.     Defendant WG Capital USA Inc. ("WG Capital") is an MCA provider organized as a domestic business corporation in New York that offers non-traditional small business financing at oppressive interest rates.

46.     Defendant Prosperum Capital LLC ("Prosperum Capital") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

47.     Defendant React Funding ("React Funding") is an MCA provider in California that, upon information and belief, is not a duly registered or organized corporate entity, but offers non-traditional small business financing at oppressive interest rates.

48.     Defendant Main Street Finance Group, LLC ("Main Street") is an MCA provider organized as a limited liability company in Florida that offers non-traditional small business financing at oppressive interest rates.

49.     Defendant CapCall, LLC ("CapCall") is an MCA provider formerly organized as a limited liability company in Delaware—registration of which has since been revoked by the state—that offers non-traditional small business financing at oppressive interest rates and was party to several agreements dated in March and April 2020 with Sosna and some of his entities.

50.     Defendant BFS Capital, Inc. ("BFS") and, upon information and belief, also doing business as BFS Lifetime is an MCA provider organized as a corporation in Delaware that offers non-traditional small business financing at oppressive interest rates.

13

51.     Defendant Apex Funding Source LLC ("Apex") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

52.     Defendant EOM Advance LLC ("EOM Advance") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates.

53.     Defendant LLSV Corp. ("LLSV") is an MCA provider organized as a corporation in New York that offers non-traditional small business financing at oppressive interest rates.

54.     Defendant WorldWide Capital Management, Inc. ("WorldWide") is an MCA provider organized as a corporation in California that offers non-traditional small business financing at oppressive interest rates.

55.     Defendant Green Fund NY ("Green Fund NY") is an MCA provider organized as an entity authorized to do business in New York that offers non-traditional small business financing at oppressive interest rates.

56.     Defendant Diesel Funding Group LLC ("Diesel Funding") is an MCA provider organized as a limited liability company in Florida that offers non-traditional small business financing at oppressive interest rates.

57.     Defendant HIFI Funding ("HIFI Fund") is an MCA provider that, upon information and belief, is not a duly registered or organized corporate entity, but that offers non-traditional small business financing at oppressive interest rates.  Upon information and belief, HIFI Fund is located New York.

14

58.     Defendant Rapid Capital Inc. ("Rapid Cap – Green Fund") and also doing business as Rapid Cap – Green Fund is an MCA provider organized as a corporation in New York that offers non-traditional small business financing at oppressive interest rates.

59.     Defendant Merchant Capital Solutions LLC ("Merchant Capital MTC aka Forward Fund") and also doing business as Merchant Capital MTC and Forward Fund is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates and was party to at least one agreement dated March 23, 2020 with Sosna and some of his entities.

60.     Defendant 60 Day Capital LLC ("60 Day Cap") is an MCA provider organized as a domestic limited liability company in New York that offers non-traditional small business financing at oppressive interest rates and was party to an agreement dated in April 28, 2020 with Sosna and some of his entities.

61.     Defendant YRB MCA Inc. ("YRB-Forward-Merchant") and also doing business as YRB-Forward-Merchant is an MCA provider organized as a corporation in New York that offers non-traditional small business financing at oppressive interest rates

62.     Defendant John Doe MCA Entities are merchant cash advance entities that provide small business financing and participated in the kiting scheme and are liable to S&T on account thereof but whose identities are not yet known to S&T.  Upon information and belief, S&T alleges that there are several entities to which Sosna has paid substantial amounts but for which the details of their corporate identity (if any) are not immediately ascertainable.  S&T reserves the right to amend its Complaint to include additional MCAs as defendants to this action that may be discovered through the course of this litigation.

63.     The Sosna Entities transferred over $73 million to the Defendants between February 2019 and May 2020 and received only the approximate amount of $30 million in net financing during that period, such that Defendants realized an ill-gotten profit of over $43 million, most of which was stolen from Plaintiff.

### **RELEVANT NON-PARTIES**

64.     Sosna was the principal agent of various entities involved in the kiting scheme.

65.     Sosna owned several businesses through which he funneled funds at a variety of banks to perpetuate the kiting scheme, referred to herein as the "Sosna Entities."[1]

66.     Several Sosna Entities held a banking relationship with S&T, referred to herein as the "Social Row Entities," which include Social Row Transitional Care, Inc. ("Social Row"), F&H Realty Holding Company, LLC and Huffman Healthcare, Inc.

67.     Sosna and the Sosna Entities had banking accounts at a number of traditional banks, including First Financial Bank ("FFB"), The Huntington National Bank ("Huntington"), Fifth Third Bank ("Fifth Third") and General Electric Credit Union ("GECU" and collectively with FFB, Huntington and Fifth Third, the "Banks").

---

[1] The Sosna Entities include Social Row Transitional Care, Inc., F&H Realty Holding Company, LLC, Huffman Healthcare, Inc., Cornell Envision, LLC, d/b/a Envision Cinemas Bar & Grill, Cornell Road Investors, LLC, Sosco Aviation, LLC, Premier Healthcare Management Company ("Premier"), Embassy Forest Hills, LLC dba Forest Hills Care Center ("Forest Hills"), Ivy Health Care Center, Inc., Kenwood Terrace Health Care Center, Inc. ("Kenwood"), Euclid Health Care, Inc. dba Madeira Health Care Center, Pleasant Ridge Care Center, Inc., Southbrook Health Care Center, Inc., The Wexford Place, Inc., and Wexford Care Center, Inc., some or all of which have been placed into one of four receiverships.

## **FACTS RELEVANT TO ALL COUNTS**

**A.     The Sosna Entities Exhaust Traditional Financing**

68.     Sosna, through the Sosna Entities, owned and operated a number of nursing homes and assisted living facilities in Ohio.

69.     These facilities operated as businesses that provided care to disabled and elderly persons in the Ohio region.

70.     Sosna opened his first healthcare business, Premier, in 1998.  Since that time, Sosna opened over a dozen facilities through the Sosna Entities and held various bank accounts and had lending relationships with the Banks in order to operate these facilities.  He has had long-standing relationships with several of the Banks that were eventually targeted in the kiting scheme, including Premier's Fifth Third accounts opened in or around 2016 and his personal accounts opened as early as 2002.

71.     In or around 2015, Sosna initiated a plan to aggressively expand his operations, which included substantial construction efforts at facilities he owned and/or managed.  To fund these projects, Sosna obtained tens of millions of dollars in financing from traditional banks.

72.     Among others, Sosna also secured financing from Plaintiff to fund the expansion. Specifically, the Social Row Entities entered into loan agreements with S&T, including a construction loan agreement and note dated May 6, 2015, a line of credit and note dated May 6, 2015 and a security agreement dated May 6, 2015.

73.     Pursuant to this security agreement, S&T was granted a security interest in substantially all of the Social Row Entities' assets, including their accounts receivable, whether then existing or thereafter arising, and the proceeds thereof, as collateral for all of the Social Row Entities' obligations to S&T.

E-FILED 07/19/2021 06:11 PM   /   CONFIRMATION 1089461   /   A 2102471   /   COMMON PLEAS DIVISION   /   IFO

74.     S&T perfected its security interest in the collateral by filing UCC financing statements with the office of the Ohio Secretary of State.

75.     Sosna and the Sosna Entities also entered into several traditional loan agreements and lines of credit with the Banks to operate and renovate existing facilities and expand to other locations.

76.     In August 2017, Sosna and the Sosna Entities experienced a setback and began experiencing significant cash flow problems.  A nursing home in Columbus, Ohio that Sosna and the Sosna Entities owned was closed due to regulatory violations, which caused a loss of about $11 million.  Due to that loss, the loans at Huntington were put into workout as the collateral was nearly depleted.

77.     At that time, Sosna and the Sosna Entities were constructing large additions to the facilities at Kenwood and Forest Hills with financing from Fifth Third.

78.     After the closing of the Columbus facility in August 2017, Fifth Third declared the primary loan in default and Sosna began to seek replacement financing.

79.     The Sosna Entities were temporarily able to secure alternative financing from other banks to fund the expansion, including several loans from FFB in 2018, in addition to receiving a refinancing of the Fifth Third loan through a participation loan from Huntington in November 2018 for approximately $70 million.[2]

80.     Despite obtaining conventional financing earlier in 2018, Sosna and his entities' cash flow problems became acute later that year, and Sosna began having difficulty making payroll

---

[2] By October 2019, the Huntington loan balance was more than $73 million and Huntington became concerned about cash flow.  Huntington declared the loan in default and moved the credit to work out.

at his various facilities.  In addition, he could no longer obtain new financing from traditional lenders because of his other defaults and financial difficulties.

**B.      Defendants Step in and Begin Financing Sosna in February 2019**

81.      Given their ongoing financial difficulties, Sosna Entities were in danger of insolvency because they lacked operating capital.  Faced with loans in default and/or workout and impending payroll costs that he could not cover, Sosna first applied to MCAs via an online application platform in or around October or November 2018.

82.      In their efforts to obtain alternative financing, Sosna and his attorney, Jill McGrail ("McGrail"), contacted a California-based broker named Caleb who told Sosna that he could introduce Sosna to companies that offered "non-traditional" financing to businesses that traditional banks would not.  These companies were MCAs.

83.      Sosna and McGrail obtained information from Caleb about the MCAs, and began applying to the MCAs for financing.

*Defendants' Predatory Contractual Terms*

84.      The MCAs do not operate like traditional lenders, nor could they legally operate as lenders given the exorbitant interest rates and origination (and other) fees they charge.  MCAs do not "lend" any funds to customers.  Instead, MCAs advance payment to a business to purchase future accounts receivable until the repayment term has been satisfied.

85.      One Defendant describes the MCA business model on its website as follows: "The Merchant Cash Advance (MCA), or Business Cash Advance is a non-loan type of business funding.  This essentially purchases a fixed amount of your business's future receivables, from credit and debit sales or other revenue deposits, at a discount.  The business cash advance online provider, like Main Street, buys a specific dollar amount of your future revenue.  Your business

19

… remits a set percentage of its daily credit and debit card sales or an ACH deduction based upon a good faith estimate of future revenue, until the full amount of purchased revenue, plus any fees, has been paid in full to the business cash advance provider."[3]

86.     By way of example, Sosna's contract with Defendant CapCall stated:

> Merchant [(Sosna)] hereby sells, assigns and transfers to [CapCall ("CC")] CC (making CC the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, ***all*** of Merchant's ***future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors*** (the "Total Gross Receipts") for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been remitted from the Merchant to CC. Total Gross Receipts, hereinafter "Receipts," is defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business without subtracting any costs or expenses.

Ex. A, CapCall Agreement dated March 23, 2020 (emphasis added).[4]

87.     The Defendant MCAs generally demanded, as a condition of financing, that Sosna provide his personal login credentials for *every* bank account that he and the Sosna Entities held. In other words, the MCAs required and gained full access to every detail of the financial operations and transactions of Sosna and his entities.

88.     For example, the agreement with High Speed Capital provided High Speed Capital complete access and unilateral control over Sosna's and the Sosna Entities' bank accounts:

> [Sosna and the contracting Sosna Entities] shall execute an agreement with HSC that shall authorize HSC to arrange for electronic fund transfer services and/or "ACH" payments of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) after the Approved Bank Account. [Sosna and the contracting Sosna Entities] ***shall provide HSC and/or its authorized agent with all information, authorization and passwords necessary to verify*** [Sosna's and the

---

[3] *See* https://www.mainstreetcash.com/cash-advance (last visited July 1, 2021).

[4] Notably, the accounts and receivables of the Social Row Entities that the MCAs purported to encumber through contractual provisions like this one were already pledged as security to S&T, and S&T had given record notice of its security interest in that collateral by filing a UCC statement before the MCAs entered into these contracts.

contracting Sosna Entities'] ***receivables, receipts and deposits into the Approved Bank Account.*** [Sosna and the contracting Sosna Entities]***shall authorize (by executing written authorizations, if required) HSC and/or its agent to deduct daily the amounts of the Initial Daily Installment (or the Adjusted Daily Installment, as the case may be) to HSC from settlement amounts which would otherwise be due to*** [Sosna and the contracting Sosna Entities] ***from electronic check transactions and to pay such amounts to HSC by permitting HSC to withdraw the Initial Daily Installment (or the Adjusted Daily Installment, as the case may be) from such an account***.  The authorization shall be irrevocable until such time when [Sosna and the contracting Sosna Entities] shall have performed its obligations under this Agreement in full.

Ex. B, High Speed Capital Agreement dated January 31, 2020, ⁋ 33 (emphasis added).

89.     The contracts between Sosna and an MCA, where they existed, provided that the MCA could retain Sosna's login credentials to the online banking portals and continue to monitor his accounts.

90.     In initiating the advance, the MCAs would also log in to Sosna's account to create and schedule an automated clearing house ("ACH") withdrawal for return payments using Sosna's credentials.

91.     Sosna was required to keep the scheduled ACH withdrawals on his account regardless of whether the account had sufficient funds on a given day.

92.     MCAs kept and continued to use Sosna's bank login credentials to monitor all of his financial transactions throughout this time.

***Defendants' Intensive Due Diligence Process***

93.     As a common practice, the MCAs use the login credentials of the customer to review every piece of financial history across the customer's entire banking portfolio.  MCAs have free reign to search every transaction, including reviewing revenue, expenses, payroll, and debt obligations.  In addition, it is commonplace that an MCA requires at least three months of banking

statements from applicants before offering financing, meaning that the MCAs have full knowledge of the financial operations of the borrower before they provide financing.[5]

94.     The MCAs intensely scrutinized Sosna's and Sosna Entities' finances, including checking past transactions, revenue streams, and daily balances prior to making an advancement decision.

95.     The MCAs were acutely aware of the businesses' financial situation, revenue, credit lines, loan obligations, and cash on-hand, and had the same access as Sosna to Sosna's online banking across all financial institutions.  In fact, some MCAs initially declined to contract with Sosna after viewing Sosna's financial history via his online banking portals.

96.     The MCAs often requested additional information about the facilities Sosna operated in Ohio.  For example, several MCAs required Sosna to drive to one of his facilities in Ohio, take photos of the interior and exterior, send the photos while still on-site, and grant location access on his phone so the recipient MCA could verify using GPS that he was in fact at that facility.

97.     An MCA wishing to grant an advance to Sosna would typically contact McGrail to facilitate the arrangement.  Some MCAs did not sign a writing memorializing the advance for each (or any) transaction.  However, Sosna maintained records of all amounts received from each MCA and amounts paid back to any MCA (or, more accurately, automatically withdrawn by the MCA itself).  An excerpt of Sosna's chart is produced below.

---

[5] *See, e.g*., Defendant EIN Cap website at http://www.eincap.com/how ("APPROVAL:  You will hear back from one of our funding specialists within 24 hours … We'll ask for your 3 months bank statements…") (last visited July 1, 2021).

| Lender | Loan Amount | Amount Repaid | Imputed Interest | Date of Loan | Term (Months) | End Date |
|---|---|---|---|---|---|---|
| IOU | 400,000 | 583,528 | 183,528 | 2/22/2019 | 18 | 8/22/2020 |
| RapidAdvance | 300,000 | 420,000 | 120,000 | 8/1/2019 | 15 | 10/22/2020 |
| Knight Capital Funding | 350,000 | 472,500 | 122,500 | 8/29/2019 | 8.5 | 5/15/2020 |
| Pearl | 251,577 | 374,850 | 123,273 | 8/29/2019 | 7.5 | 4/15/2020 |
| OneFunder | 200,000 | 288,000 | 88,000 | 9/5/2019 | 7 | 4/5/2020 |
| ROC Funding | 150,000 | 213,000 | 63,000 | 9/12/2019 | 6.5 | 3/25/2020 |
| Knight Capital Funding | 250,000 | 340,000 | 90,000 | 10/21/2019 | 9.2 | 7/17/2020 |
| Everest Business Funding | 125,000 | 180,000 | 55,000 | 12/4/2019 | 7.2 | 7/1/2020 |
| Direct Cash Group | 500,000 | 699,500 | 199,500 | 12/30/2019 | 3 | 3/31/2020 |
| Kash Capital | 275,000 | 398,750 | 123,750 | 1/8/2020 | 3 | 4/8/2020 |
| Addy Source | 500,000 | 779,500 | 279,500 | 1/22/2020 | 2 | 3/22/2020 |
| EIN Cap | 495,000 | 727,660 | 232,660 | 1/22/2020 | 3 | 4/22/2020 |
| Kash Capital | 300,000 | 449,700 | 149,700 | 1/22/2020 | 3 | 4/22/2020 |
| Region Capital | 450,000 | 674,550 | 224,550 | 1/22/2020 | 2 | 3/22/2020 |
| Baypoint Funding | 200,000 | 299,800 | 99,800 | 1/23/2020 | 2 | 3/23/2020 |
| Regis Capital | 200,000 | 299,800 | 99,800 | 1/23/2020 | 2 | 3/23/2020 |
| Yes Capital | 425,000 | 662,575 | 237,575 | 1/23/2020 | 2 | 3/23/2020 |
| Avanza | 200,000 | 450,000 | 250,000 | 1/27/2020 | 2 | 3/27/2020 |
| BFS Lifetime | 800,000 | 1,200,000 | 400,000 | 1/27/2020 | 2 | 3/27/2020 |
| Oasis Funding - JLEAK | 200,000 | 299,800 | 99,800 | 1/29/2020 | 2 | 3/29/2020 |
| Queen Funding | 250,000 | 374,750 | 124,750 | 1/29/2020 | 2 | 3/29/2020 |
| Regal Capital | 215,000 | 335,185 | 120,185 | 1/29/2020 | 2 | 3/29/2020 |
| 24 Capital | 200,000 | 298,000 | 98,000 | 1/30/2020 | 2 | 3/30/2020 |
| BMF Capital | 300,000 | 477,000 | 177,000 | 1/30/2020 | 2 | 3/30/2020 |
| Lifetime Funding | 300,000 | 449,700 | 149,700 | 1/30/2020 | 2 | 3/30/2020 |
| Reserve Funding | 150,000 | 224,850 | 74,850 | 1/30/2020 | 2 | 3/30/2020 |
| Smart Advance | 250,000 | 397,500 | 147,500 | 1/30/2020 | 2 | 3/30/2020 |
| SPG Advance | 250,000 | 389,750 | 139,750 | 1/30/2020 | 2 | 3/30/2020 |
| Future Advance Capital | 200,000 | 299,800 | 99,800 | 1/31/2020 | 2 | 3/31/2020 |
| High Speed Capital | 500,000 | 745,000 | 245,000 | 1/31/2020 | 2 | 3/31/2020 |
| LRM | 200,000 | 299,800 | 99,800 | 2/4/2020 | 2 | 4/4/2020 |
| Green Capital | 600,000 | 899,400 | 299,400 | 2/5/2020 | 2 | 4/5/2020 |
| WG Capital | 500,000 | 749,500 | 249,500 | 2/5/2020 | 2 | 4/5/2020 |
| Addy Source | 400,000 | 663,600 | 263,600 | 2/7/2020 | 2 | 4/7/2020 |
| BMF Capital | 400,000 | 639,600 | 239,600 | 2/7/2020 | 2 | 4/7/2020 |
| Prosperum Capital | 200,000 | 299,800 | 99,800 | 2/7/2020 | 2 | 4/7/2020 |
| Kash Capital | 250,000 | 374,750 | 124,750 | 2/11/2020 | 2 | 4/11/2020 |

23

| | | | | | | |
|---|---|---|---|---|---|---|
| LRM | 250,000 | 374,750 | 124,750 | 2/11/2020 | 2 | 4/11/2020 |
| Green Capital | 500,000 | 749,500 | 249,500 | 2/12/2020 | 2 | 4/12/2020 |
| React Funding | 150,000 | 224,850 | 74,850 | 2/12/2020 | 2 | 4/13/2020 |
| Main Street | 1,000,000 | 1,499,000 | 499,000 | 2/13/2020 | 2 | 4/13/2020 |
| BMF Capital | 1,200,000 | 2,038,800 | 838,800 | 2/14/2020 | 2 | 4/14/2020 |
| Avanza | 500,000 | 750,000 | 250,000 | 2/26/2020 | 2 | 4/26/2020 |
| CapCall | 750,000 | 1,124,250 | 374,250 | 2/26/2020 | 2 | 4/26/2020 |
| MCA - Blue | 500,000 | 750,000 | 250,000 | 2/26/2020 | 2 | 4/26/2020 |
| BFS | 500,000 | 750,000 | 250,000 | 2/27/2020 | 2 | 4/27/2020 |
| Addy Source | 400,000 | 639,600 | 239,600 | 2/28/2020 | 2 | 4/28/2020 |
| Apex | 250,000 | 399,750 | 149,750 | 2/28/2020 | 2 | 4/28/2020 |
| EOM Advance | 250,000 | 399,750 | 149,750 | 2/28/2020 | 2 | 4/28/2020 |
| Gold Advance | 110,000 | 175,890 | 65,890 | 2/28/2020 | 2 | 4/28/2020 |
| Green Capital | 500,000 | 749,500 | 249,500 | 2/28/2020 | 2 | 4/28/2020 |
| LLSV | 250,000 | 399,750 | 149,750 | 2/28/2020 | 2 | 4/28/2020 |
| Reserve Funding | 200,000 | 319,800 | 119,800 | 2/28/2020 | 2 | 4/28/2020 |
| DCL | 125,000 | 194,875 | 69,875 | 3/2/2020 | 2 | 5/2/2020 |
| Regal Capital | 215,000 | 335,185 | 120,185 | 3/2/2020 | 2 | 5/2/2020 |
| CapCall | 250,000 | 374,750 | 124,750 | 3/4/2020 | 2 | 5/4/2020 |
| 24 Capital | 300,000 | 447,000 | 147,000 | 3/5/2020 | 2 | 5/5/2020 |
| Green Fund NY | 1,050,000 | 1,680,000 | 630,000 | 3/5/2020 | 2 | 5/5/2020 |
| WorldWide | 200,000 | 298,000 | 98,000 | 3/5/2020 | 2 | 5/5/2020 |
| CapCall | 200,000 | 299,800 | 99,800 | 3/6/2020 | 2 | 5/6/2020 |
| MCA ALL YEAR | 250,000 | 372,500 | 122,500 | 3/6/2020 | 2 | 5/6/2020 |
| React Funding | 250,000 | 374,750 | 124,750 | 3/6/2020 | 2 | 5/6/2020 |
| Green Fund NY | 300,000 | 480,000 | 180,000 | 3/9/2020 | 2 | 5/9/2020 |
| Advance Merchant Svcs | 750,000 | 1,124,250 | 374,250 | 3/11/2020 | 2 | 5/11/2020 |
| Avanza | 1,000,000 | 1,500,000 | 500,000 | 3/11/2020 | 2 | 5/11/2020 |
| CapCall | 250,000 | 374,750 | 124,750 | 3/13/2020 | 2 | 5/13/2020 |
| Diesel Funding | 225,000 | 337,275 | 112,275 | 3/13/2020 | 2 | 5/13/2020 |
| Worldwide | 200,000 | 298,000 | 98,000 | 3/13/2020 | 2 | 5/13/2020 |
| CapCall | 200,000 | 299,800 | 99,800 | 3/17/2020 | 2 | 5/13/2020 |
| Regal Capital | 200,000 | 299,800 | 99,800 | 3/17/2020 | 2 | 5/13/2020 |
| CapCall | 200,000 | 299,800 | 99,800 | 3/23/2020 | 2 | 5/15/2020 |
| Green Capital | 500,000 | 749,500 | 249,500 | 3/24/2020 | 2 | 5/19/2020 |
| Avanza | 750,000 | 1,125,000 | 375,000 | 3/25/2020 | 2 | 5/19/2020 |
| HIFI Fund | 2,050,000 | 3,280,000 | 1,230,000 | 3/25/2020 | 2 | 5/19/2020 |
| CapCall | 500,000 | 750,000 | 250,000 | 3/30/2020 | 2 | 5/26/2020 |
| Regal Capital | 215,000 | 322,285 | 107,285 | 3/30/2020 | 2 | 5/26/2020 |
| Rapid Cap - Green Fund | 1,500,000 | 2,400,000 | 900,000 | 4/1/2020 | 2 | 5/27/2020 |

24

| CapCall | 225,000 | 337,275 | 112,275 | 4/2/2020 | 2 | 5/29/2020 |
|---|---|---|---|---|---|---|
| Green Fund NY | 400,000 | 640,000 | 240,000 | 4/2/2020 | 2 | 5/29/2020 |
| BMF Capital | 1,350,000 | 2,146,500 | 796,500 | 4/6/2020 | 2 | 6/1/2020 |
| BMF Capital | 1,250,000 | 1,987,500 | 737,500 | 4/6/2020 | 2 | 5/27/2020 |
| Green Capital | 750,000 | 1,124,250 | 374,250 | 4/7/2020 | 2 | 6/4/2020 |
| CapCall | 1,000,000 | 1,499,000 | 499,000 | 4/10/2020 | 2 | 6/8/2020 |
| Avanza | 750,000 | 1,125,000 | 375,000 | 4/16/2020 | 2 | 6/11/2020 |
| CapCall | 1,000,000 | 1,499,000 | 499,000 | 4/16/2020 | 2 | 6/11/2020 |
| CapCall | 1,000,000 | 1,499,000 | 499,000 | 4/22/2020 | 2 | 6/18/2020 |
| Green Capital | 700,000 | 1,049,300 | 349,300 | 4/22/2020 | 2 | 6/18/2020 |
| CapCall | 1,000,000 | 1,499,000 | 499,000 | 4/28/2020 | 2 | 6/23/2020 |
| Merchant Capital MTC aka Forward Fund | 2,000,000 | 2,798,000 | 798,000 | 4/28/2020 | 2 | 6/24/2020 |
| Kash Capital | 750,000 | 1,087,500 | 337,500 | 4/29/2020 | 2.2 | 6/29/2020 |
| Avanza | 2,500,000 | 3,750,000 | 1,250,000 | 5/4/2020 | 2 | 6/30/2020 |
| YRB-Forward-Merchant | 1,000,000 | 1,399,000 | 399,000 | 5/5/2020 | 2 | 7/1/2020 |
| 60 Day Cap | 1,200,000 | 1,800,000 | 600,000 | 5/6/2020 | 2.8 | 7/15/2020 |
| Kash Capital | 750,000 | 1,087,500 | 337,500 | 5/6/2020 | 2.2 | 7/7/2020 |

### *The MCAs Share Common Ownership, Control, And Information About Targets Like Sosna*

98.     Upon information and belief, S&T alleges that some or all of the Defendants are interconnected, intertwined, or otherwise work in concert to perpetrate their predatory practices.

99.     Upon information and belief, S&T alleges that some or all of the Defendants share addresses, offices, or places of business with other MCAs.

100.     For example, many Defendants have multiple addresses listed publicly either on their website or in business records.  Defendant Green Capital and Defendant High Speed share an address of 116 Nassau Street, Suite 804, New York, NY 10038.  Defendant Yellowstone and Defendant EIN Cap share an address of 160 Pearl Street, 5th Fl., New York, NY 10005.  Defendants Apex, Green Capital, and LRM all share an address of 187 Wolf Road, Suite 101, Albany, NY 12205.  Defendant Region Capital and Defendant Regis Capital share an address of 323 Sunny Isles Boulevard, Sunny Isles, FL 33160.  Defendant Knight Capital Funding and

Defendant Everest Business Funding share an address of 1200 South Pine Island Road, Plantation, FL 33324.

101.     Upon information and belief, S&T alleges that some or all of the Defendants share information obtained from applicants for cash advance services with other MCAs.

102.     For example, though Sosna submitted an application to a specific MCA using a third-party platform, multiple other MCAs that he had not applied to would contact Sosna in response and know the details of the confidential information he provided in his application. Sosna did not supply this information other than through the platform, such that it is clear these other MCAs were given access to the information intended for another company. Accordingly, on information and belief, it is alleged that the MCAs worked in concert and actively shared information amongst themselves regarding potential borrowers that they had not been authorized to share.

103.     Upon information and belief, S&T alleges that these third-party platforms are used to consolidate information so the few MCA decision makers may choose an MCA entity from which they will make an offer, even though the application was made to a specific MCA.

104.     Many MCAs tended to use one of few platforms, such as Invogen, to solicit applications. On information and belief, the MCAs work in concert to share access to applicant information contained in these platforms without the applicant's consent, and use that information to target potential borrowers.

105.     For example, when Sosna would apply through a given platform to a specific MCA, he and McGrail would subsequently receive a significant number of cold calls from MCAs other than the one to which he had just applied, and each caller appeared to have the specific information that he had just provided to a single MCA on a platform. These platforms appear to have shared

26

this information with other MCAs or the MCA to which he applied voluntarily shared the received information with other MCAs.

106.    Further, Sosna was contacted by several MCAs that knew his transaction history and the details of any offers he had already been given, which would not be available but for receiving the information through the platform on which Sosna applied or through the MCA through which he had procured funding.

107.    Likewise, when communicating with Sosna, the MCAs stated that they were aware of other applications Sosna had made to different MCAs and the resulting offers made by MCAs.

108.    Upon information and belief, S&T alleges that some or all of the Defendants disregard the formality of their corporate form and will advance funds from different MCA entities regardless of which MCA contracted with or offered funds to the recipient.  As stated above, the MCAs use login credentials for a customer's bank accounts and set up ACH withdrawals for repayment.  However, the MCA with which the customer accepts an offer is not necessarily the entity that grants and wires the funds for the advance, further confirming that the MCAs work in concert and often do not observe distinctions between purportedly different business entities.

109.    For example, the MCAs did not necessarily set up these ACH withdrawals in the same Sosna Entity account in which they had advanced the funds, nor did the MCAs require repayment from the same Sosna Entity they granted funds.

110.    Indeed, Sosna and the Sosna Entities did not always receive funds from the MCA with which Sosna had contracted.  For example, when Sosna reached a financing agreement with Yellowstone through one of its subsidiaries, the Sosna Entity set up to receive the funds would receive one wire with half of the funds from Defendant Green Capital and a separate wire with the

remaining half of the funds from Defendant High Speed Capital, which was against both the written and oral agreements to which Sosna entered.

***Defendants' Practice of Withdrawing Funds in Excess of Obligation***

111.   The MCA industry has been the subject of recent action by state and federal government agencies and finance and lending critics.  For example, a recent investigation by the Federal Trade Commission ("FTC") led to a settlement of charges against Yellowstone—an MCA with which Sosna contracted, along with several of its affiliate entity MCAs—for fraud (the "FTC Complaint").[6]

112.   In the FTC Complaint, the FTC sought disgorgement of ill-gotten gains and civil penalties for Yellowstone's pervasive practice of making additional ACH withdrawals beyond a customer's obligation.  Yellowstone maintained in interactions with customers that this was a practice applied to every customer wherein the ACH withdrawals would be "delayed" for 4-5 days after Yellowstone's internal system recognized that the obligation had been fulfilled.  Yellowstone did not return any of the proceeds from a delay in ACH withdrawal completion that went above the obligation.  Following the FTC complaint, Yellowstone agree to a settlement and consent order requiring it to repay $10 million to customers it had wrongfully stolen funds from and imposing an injunction on Yellowstone and its owners to prevent them from engaging in similar practices in the future.

113.   Based on Sosna's experience, this practice is perpetrated by other MCAs, including those with which Sosna and the Sosna Entities transacted.

---

[6] *See* Complaint filed August 3, 2020 in *Federal Trade Commission v. Yellowstone Capital LLC*, *et al.*, No. 20-cv-6023 (S.D.N.Y.); Stipulated Order for Permanent Injunction and Monetary Judgment filed April 21, 2021 in *Federal Trade Commission v. Yellowstone Capital LLC*, *et al.*, No. 20-cv-6023 (S.D.N.Y.).

114. Indeed, Defendants stole several million dollars through unauthorized direct transfers in excess of amounts owed under their agreements with Sosna.

115. When Sosna inquired about the excess withdrawals, some MCAs maintained that these withdrawals were not performed by their business, and that the withdrawal must have come from a different MCA or even a thief, despite Sosna having the business information of the withdrawing entity that showed it was that particular MCA.

## C. The MCAs Ratchet Up Pressure and Begin Threatening Violence

116. As Sosna's financial condition worsened and his need for immediate cash increased, Sosna and McGrail became increasingly inundated with emails, text messages, and phone calls from various MCAs aggressively offering advances at even higher interest rates than initial offers but typically in larger advance amounts as well.

117. The ACH withdrawals, many of which required ***daily*** payments of thousands to tens of thousands of dollars, became too burdensome on the Sosna Entities' cash flow. Payments reached as high as $93,750, which was pulled daily from a Sosna Entity's account for an amount funded on May 4, 2020—just before the kite collapsed.

118. On certain occasions, an ACH withdrawal would not clear due to insufficient funds. MCAs that did not receive payment would contact Sosna directly or through McGrail to threaten his own physical safety and that of his wife, children, and other family members.

119. On one such occasion, an MCA representative contacted Sosna by phone and stated that he had Sosna's children's addresses and knew where they lived. He stated that he was traveling to Cincinnati, where Sosna lived at the time, and was not leaving until payment was made. A representative for this MCA named Sean was on the phone while these threats were made

in an effort to elicit payment and intimidate Sosna into obtaining funds, regardless of the source or method.

120.    The MCAs constantly informed Sosna that they were closely monitoring all of Sosna's and the Sosna Entities' bank account history, and it appeared that the MCAs had other sources of information regarding Sosna's interaction with various MCAs.

121.    On one occasion Sosna attempted to conceal from Yellowstone the fact that he was receiving advances from other MCAs.  Jake Saltzman at Yellowstone confronted Sosna and informed him he had learned of the other financing from other MCAs from the online platforms they used, further confirming that the MCAs worked in concert to share financial information.

122.    The MCAs had absolute access to and use of Sosna's and the Sosna Entities' bank accounts, as demonstrated by the ***_daily_*** ACH withdrawals the MCAs initiated in the accounts, with certain withdrawals being entirely outside of Sosna's obligations to repay any advance and amounting to millions of dollars.  The MCAs had essentially free reign to direct payments in and out of Sosna's and the Sosna Entities' accounts.

123.    The MCAs acted together in concert to extract funds from Sosna and the Sosna Entities as each was privy to the others' offers, advances, transactions, payments, and relationship with Sosna.  Upon information and belief, S&T alleges that the MCAs used the platforms—utilized by Sosna to apply for advances—to share certain information about Sosna and the Sosna Entities even before any given MCA had contracted with Sosna for an advance.

124.    After an MCA was given Sosna's banking login credentials, that MCA was then privy to the same information all other MCAs with access had, which demonstrated that Sosna had not only become extremely indebted to upwards of 50 MCAs, but, once Sosna began kiting checks in 2019, that he had also begun kiting checks to sustain a positive cash flow.

125.     Defendants had superior knowledge to that of any other creditor, lender, or financial institution because Defendants had access to every account in Sosna's control, not just those at a single financial institution or for a single entity.

126.     Defendants were aware that their predatory practices necessarily required Sosna to continue to grow his accounts receivable to meet the daily payment obligations at rates that could not be sustained through lawful means.   For example, Defendants advanced payments at shockingly oppressive interest rates:

     a.   Green Fund NY advanced funds to the Sosna Entities at an annualized interest rate of 600%.

     b.   Rapid Cap – Green Fund advanced funds to the Sosna Entities at an annualized interest rate of 552%.

     c.   SPG Advance advanced funds to the Sosna Entities at an annualized interest rate of 546%.

     d.   In only two of Sosna's transactions with the MCAs did the annualized interest rate fall below 300%.

127.     Not only did the MCAs fund at increasingly exorbitant rates, but the MCAs began shortening repayment periods once they learned of the kite.   Sosna's first recorded MCA transaction in early 2019 allowed an 18 month repayment.   In late 2019, those periods shortened to six to nine months.   After Sosna began kiting, the MCAs would no longer fund Sosna without a promised repayment period of two or three months.   Upon information and belief, the MCA shortened the term of the loans with the knowledge of the kiting activity as a means to avoid the eventual collapse of the check kiting scheme.

128.    In the final months of the kite, the MCAs began demanding even higher daily withdrawals than before, all of which exceeded $25,000 per day.

129.    As the kite grew, the MCAs knew they had to protect their interests by shortening the period for repayment and increasing the amount of daily pulls.  The MCAs were aware the kite would collapse at this rate but the profits from stealing kited funds were too rich to forego.

130.    Under pressure due to the MCAs' predatory practices, oppressive interest rates and repayment terms, and threats, Sosna decided to use other, illegal ways to fund these automatic repayments while also operating his assisted living facilities.

**D.    In Late 2019, Sosna Begins the Kiting Scheme, and Defendants Extract Over $43 Million In Stolen Funds from the Scheme before it Collapses.**

131.    By October 2019, after the MCAs had withdrawn his entities' liquid assets from his accounts, Sosna began kiting checks between the Banks.  Initially, Sosna deposited kited checks on a daily basis into the various bank accounts at Huntington, Fifth Third, FFB or S&T to cover that day's operating expenses.

132.    Certain banks with whom Sosna worked with gave access to a one-day so-called "float" on their accounts, meaning that checks could be deposited into those accounts and immediate access to the funds was given.[7]  Sosna exploited this float to facilitate his check kiting.

133.    As the kiting scheme continued, the amount of funds that needed to be deposited every day to keep the kite going increased dramatically.  Eventually, Sosna was transferring millions of dollars every day between the accounts held at S&T, FFB, Fifth Third, and Huntington.

134.    From their vantage point, given full access to all of Sosna's accounts across all financial institutions, the MCAs were able to see all of these kiting transactions in real time.

---

[7] S&T did not allow access to any "float."

135.    As the kiting scheme took off, Sosna and McGrail received even more offers for advances from the MCAs.  Sosna believes that upon learning that Sosna was kiting, the MCAs became motivated to advance larger sums at higher rates because they *knew* that they could obtain the excessive payments with the funds stolen from S&T.

136.    The MCAs not only had full access to the accounts, but they monitored the accounts and even complimented Sosna on the substantial growth over a short time, acknowledging that they were aware of the kiting scheme.  One such occasion, an MCA representative complimented Sosna on the fact that the revenue stream for one entity grew from approximately $600,000 to $6 million in a matter of weeks as a result of the kiting scheme.  It was obvious that Sosna could not possibly have generated such growth through legitimate means.

137.    MCAs are experts in monitoring and purchasing receivables.[8]  Based on this expertise, Defendants had specialized knowledge to understand that the sharp increases in Sosna's revenue were not achieved through legal means.  The Defendants also had full access to the accounts so they could see that this "revenue" was derived not from business revenue, but from kiting transactions.  Indeed, given their vantage point, Defendants could see both ends of every kiting transaction that Sosna initiated.  Despite this specialized knowledge and awareness of the kiting activity, the MCAs pumped more capital into the scheme and encouraged Sosna to "keep it up."

138.    Given the information and access the MCAs had and the control and monitoring the MCAs exercised over the accounts, Sosna believes that there is no possible way that

---

[8]  *See, e.g.*, https://www.mainstreetcash.com/about-us (Defendant Main Street Cash's website explaining that it employs a "team of U.S.-based funding specialists" as it "purchases a fixed amount of your business's future receivables"); http://www.eincap.com/about (Defendant EIN Cap, Inc. explaining that it has a "team of experienced finance experts" and will "purchase a specific dollar amount of your business's future credit card sales or receivables").

Defendants did not actually know that the money being paid to the MCAs was directly supplied by stolen funds procured through kiting.

***The Kite Collapses in the Spring of 2020***

139.    In February and March 2020, Huntington declared Sosna's pre-existing loans in default and required him to close or move his accounts.

140.    At the time Huntington declared its loan in default, the balance was more than $70 million.[9]  When Huntington declared the loan in default, it froze the accounts at Huntington so Sosna began using other accounts to keep the kiting scheme going.

141.    In mid-May 2020, the GECU accounts were used as part of the kiting scheme for the first time.  The scheme continued for only a few more days until it finally collapsed.  Even in that short period of time, an overdraft of more than $9 million was created in the various GECU accounts.

142.    In the final stages of the kiting scheme, on May 15, 2020, Social Row, under the direction of Sosna, used its internal check processing system to deposit kited checks totaling $26,160,000 into a Social Row account at S&T.  These checks were written against the Sosna Entities' accounts.  These checks were ultimately dishonored by the drawing bank and S&T never received funds to cover these deposits.

143.    Also on May 15, 2020, Social Row wrote checks against that S&T account to various Sosna Entities in the aggregate amount of $26,040,000 – wholly depleting that day's deposit into the account.  S&T honored those checks, and the proceeds of those checks were deposited into accounts maintained by the Sosna Entities at FFB.

---

[9] Huntington and FFB were syndicated co-lenders on the loan.

144. Then on May 18, 2020, Social Row, again under the direction of Sosna, used its internal check processing system to deposit a new set of kited checks, this time totaling $33,080,000, into a Social Row account at S&T. These checks were likewise written against the Sosna Entities' accounts. These checks were ultimately dishonored by the drawing bank and S&T never received funds to cover these deposits.

145. Also on May 18, 2020, Social Row wrote checks against the S&T account to various Sosna Entities in the aggregate amount of $33,115,000 – wholly depleting that day's deposit. S&T honored those checks, and the proceeds of those checks were deposited into accounts maintained by the Sosna Entities at FFB. For these May 15 and May 18 transactions, no funds came into the S&T accounts to cover the amounts withdrawn and honored by S&T.

146. S&T has not recovered these stolen funds, and has suffered a $58 million loss.

147. By the end of the kiting scheme, the MCAs had extracted over $73 million from Sosna in just a year, having funded him only about $30 million. As a result, they extracted over $43 million in profit from the scheme, most of which came from funds that were stolen from S&T. In contrast, S&T had lost over $58 million that Sosna stole with Defendants' help and encouragement.

148. Therefore, because the MCAs profited from their participation in the fraud and actual knowledge of and encouragement of the kiting scheme, S&T seeks to recover its loss. Its loss is a direct result of the predatory practices the MCAs used to extort millions of dollars from Sosna and their participation in advancing and prolonging the kite.

149. Moreover, the "receivables" that Defendants purportedly purchased from Sosna to justify their extraction of over $73 million, were pledged security of S&T's on which S&T had filed UCC financing statements. Accordingly, Defendants were on actual or constructive notice

that the funds they were extracting from Sosna's accounts were not his to give, and were security for money Sosna owed to S&T.

## COUNT I

### (Fraud)
### (All Defendants)

150.    S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 149 of this Complaint as though fully set forth herein.

151.    As set forth above, Defendants acted in concert to encourage, advance, and accelerate the volume of the kiting scheme by assisting Sosna and the Sosna Entities by funding the scheme, taking funds that were secured collateral for debts Sosna owed to S&T, and prolonging the scheme by keeping it afloat while the MCAs extracted millions of dollars stolen from Plaintiff.

152.    As co-conspirators with Sosna and the Sosna Entities and participants in the scheme, Defendants are liable for the misrepresentations made by Sosna to S&T that the checks written on his accounts were backed by good funds, which they were not as the funds were stolen proceeds from the kiting scheme.

153.    Given their birds-eye view of all transactions that Sosna was making, Defendants knew that the representations he made to the Banks, and specifically S&T, that the checks written on the accounts were backed by good funds were false because (1) the kiting scheme generated the funds and the funds were thus stolen and (2) Defendants improperly contracted with Sosna and the Sosna Entities to purchase future accounts receivable that S&T had a superior interest in.

154.    Defendants continued to advance payments to and profit from the false representations made to the Banks by Sosna and the Sosna Entities that the checks deposited in the course of the kiting scheme were true and correct.

155.    Defendants continued to advance payments to and profit from these false representations with the knowledge of their falsity or with utter disregard and recklessness of their falsity because Defendants knew that Sosna was paying Defendants with stolen bank funds.

156.    Defendants saw an opportunity to siphon a virtually endless pool of money and thus intentionally sustained Sosna's and the Sosna Entities' cash flow by providing more so that they could reap the benefit of repayment at higher rates, knowing that it would consist of stolen bank funds.

157.    Defendants worked in concert to encourage, intentionally advance, and accelerate the volume of the kiting scheme by applying intense pressure to Sosna by way of physical threats and intimidation in order to sustain the millions of dollars of profit derived from the stolen funds.

158.    For example, one MCA called Sosna directly stating he knew his and his children's addresses, that he would be visiting Sosna, and that he would not be leaving Sosna's city of residence until he received full repayment, all of which, upon information and belief, was done with the intent to require Sosna to kite a larger sum to generate enough to cover the repayment.

159.    As a direct and proximate result of the foregoing, S&T suffered monetary loss and incurred liability in an amount to be proven at trial, but in excess of $58 million.

## COUNT II

### (Aiding and Abetting Fraud)
### (All Defendants)

160.    S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 159 of this Complaint as though fully set forth herein.

161.    As set forth above, the Defendants had actual knowledge that Sosna's conduct was fraudulent because they had the same access to Sosna's bank accounts and access to the information other MCAs had originally obtained, Defendants closely monitored those accounts,

37

and Defendants made comments to Sosna acknowledging that he was kiting funds.  In addition, the increase in offerings upon acknowledging the kite demonstrates that Defendants not only had actual knowledge of the kiting scheme, but they knew their repayment was generated through the kiting scheme.

162.    Defendants provided substantial assistance or encouragement to Sosna in carrying out the tortious acts asserted herein by encouraging, intentionally advancing, and accelerating the volume of the kiting scheme by continuously supplying more funds in advances knowing that the repayment would be comprised of funds stolen from the Banks through the kiting scheme.

163.    Defendants' advances perpetuated the length of the kiting scheme and the volume of the loss because but for the advances made to Sosna and the Sosna Entities, Sosna would not have been able to meet his financial obligations and his kiting would have come to light sooner.

164.    As a direct and proximate result of the foregoing, S&T suffered monetary loss and incurred liability in an amount to be proven at trial, but in excess of $58 million.

## COUNT III

### (Civil Conspiracy)
### (All Defendants)

165.    S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 164 of this Complaint as though fully set forth herein.

166.    Civil conspiracy under Ohio law has been defined as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Minarik v. Nagy*, 8 Ohio App.2d 194, 196, 193 N.E.2d 280 (1963).

167.    Defendants were in agreement with one another, as a group of MCAs, to advance payments at oppressive interest rates with the intent to extort business owners such as Sosna to

repay regardless of means or methods to obtain the funds. Defendants' predatory practices have resulted in regulatory action and judicial injunctions prohibiting those practices.

168.     In addition to the conspiracy among Defendants, Defendants were also involved in an unlawful conspiracy with Sosna. Sosna and the Defendants agreed to an arrangement whereby the Defendants would advance funds with the expectation that Sosna would sustain a large enough kite that the stolen funds could cover the repayment amount to Defendants.

169.     Sosna has admitted to felony bank fraud and pled guilty in the United States District Court for the Western District of Pennsylvania as the orchestrator of the kiting scheme.

170.     The kiting scheme was admitted by Sosna to have been perpetrated among the Defendants causing harm to the S&T. Defendants' coordinated behavior evinces purposeful fraudulent behavior with a common design or purpose to work in conjunction with the kiting scheme to commit torts to injure S&T and the Banks.

171.     As a direct and proximate result of Defendants' participation in the conspiracy to defraud, S&T suffered monetary loss and incurred liability in an amount to be proven at trial, but in excess of $58 million.

## **COUNT IV**

### **(Conversion)**
### **(All Defendants)**

172.     S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 171 of this Complaint as though fully set forth herein.

173.     Under Ohio law, conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner or withholding it from his possession under a claim inconsistent with his rights. Ohio law further provides that property which is subject to a claim of conversion can include identifiable monies, accounts, and the proceeds thereof.

39

174.     S&T advanced specific, identifiable funds on behalf of the Social Row Entities to cover checks that, but for the kiting scheme, would otherwise have been dishonored and which has resulted in claims on the part of S&T against the Social Row Entities.  Because these were funds advanced on behalf of the Social Row Entities, these specific funds are assets of the Social Row Entities and S&T.

175.     As of the filing hereof, the transferred property, including (1) the accounts receivable and the proceeds thereof and (2) the monies advanced by S&T, are in the dominion and possession of the Defendants, all in contravention of the S&T's rights to such transferred property, all inconsistent with S&T's rights.

176.     The Defendants committed disposition and wrongful acts as to the transferred property, which as aforesaid were the property of and belonged to the Social Row Entities, and thus S&T, when the Defendants converted them.

177.     As a direct and proximate result of the foregoing, S&T suffered monetary loss and incurred liability in an amount to be proven at trial, but in excess of $58 million.

## COUNT V

### (Conversion of Collateral)
### (All Defendants)

178.     S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 178 of this Complaint as though fully set forth herein.

179.     Pursuant to the S&T loan contracts with Sosna and the Social Row Entities, S&T has a first-priority security interest in the Social Row Entities' accounts receivable and all proceeds and products thereof, including the transfers to the MCAs.

180.     At all times relevant hereto, S&T has been entitled to immediate possession of the accounts receivable collected and transferred to the Defendants.

181.    The Defendants had actual or constructive knowledge that S&T had senior rights to the accounts receivable on account of a perfected first-priority security interest through, among other things, S&T's Uniform Commercial Code financing statements filed of record with the Ohio Secretary of State.

182.    Notwithstanding that knowledge, the Defendants proceeded to wrongfully and in bad faith collect more than $73 million from accounts receivable allegedly purchased from the Sosna Entities and specifically the Social Row Entities, which accounts receivable are collateral subject to S&T's first-priority security interest.

183.    Through such action, the Defendants are now exercising dominion and possession over S&T's property – the accounts receivable and their proceeds.

184.    As a result of the foregoing, S&T has been damaged in an amount equal to the full extent of S&T's collateral which has been wrongfully converted, collected and retained by the Defendants.

### COUNT VI

### (Unjust Enrichment)
**(All Defendants)**

185.    S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 184 of this Complaint as though fully set forth herein.

186.    Defendants received a benefit when they took funds via ACH withdrawals, despite knowing those funds to be part of the kiting scheme and therefore stolen from S&T.

187.    Defendants appreciated this benefit because Defendants appropriated the funds procured through the kiting scheme.

188.    Defendants accepted and have retained the benefit conferred by S&T by continuing to hold those funds in their possession.

41

189.     As a direct and proximate cause of Defendants' actions, S&T suffered monetary loss and incurred liability in an amount to be proven at trial.

## COUNT VII

**(Ohio Civil Racketeering)**
**(All Defendants)**

190.     S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 189 of this Complaint as though fully set forth herein.

191.     Upon information and belief, S&T alleges that Defendants violated the Ohio Corrupt Practices Act, Ohio R.C. § 2923.31, *et seq.* by encouraging, advancing, and accelerating the volume of the kiting scheme.

192.     Each of the Defendants is a "person" within the meaning of R.C. § 2923.31(G).

193.     Upon information and belief, S&T alleges that the Defendants formed an "enterprise" within the meaning of R.C. § 2923.31(C).  This enterprise was and is an associated-in-fact enterprise, consisting of some or all of the Defendants named herein, and may include additional MCAs of which S&T is not yet aware.

194.     Upon information and belief, S&T alleges that Defendants continue to have an ongoing, stable working relationship and delegation of duties among themselves, as well as a common purpose of defrauding S&T and other business owners, individuals, and financial institutions to enrich themselves.

195.     Upon information and belief, S&T alleges that Defendants have conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprise through a pattern of corrupt activity as defined in R.C. 2923.31(I), that is, activity unlawful under 18 U.S.C. § 1961(1) (namely, multiple acts constituting bank fraud under 18 U.S.C. § 1344) and under R.C. 2913.11 (namely, multiple instances of passing bad checks).

42

196.    Upon information and belief, S&T alleges that Defendants' actions in and around the kiting scheme S&T are part of a pattern of corrupt activity within the meaning of 2923.31(E). The above alleged acts of corrupt activity by the Defendants were related to the same enterprise and not isolated.  Rather, these corrupt activities are related because they had the same or similar purpose, result, participants, victims, and methods of commission.  Further, the Defendants' corrupt activities are not so connected that they constitute a single event, but rather, a pattern of incidents over the span of (at least) several days.

197.    Upon information and belief, S&T alleges that Defendants' conduct represents an ongoing RICO enterprise, which projects into the future with a threat of repetition.

198.    Defendants have exercised these predatory practices on other businesses, and upon information and belief, to the detriment of other financial institutions and creditors of those businesses.

199.    As a direct and proximate result of the Defendants' violations of R.C. § 2923.31 *et seq*. described above, S&T has been damaged in the amount in excess of $58 million, which damages shall be trebled pursuant to R.C. § 2923.34(E).

200.    S&T is also entitled to an award of attorneys' fees in this matter, pursuant to R.C. § 2923.34(F).

## COUNT VIII

### (Interference with Contractual Relations)
### (All Defendants)

201.    S&T incorporates by this reference and repeats and re-alleges each and every allegation contained in paragraphs 1 – 200 of this Complaint as though fully set forth herein.

202.    Pursuant to the agreements for the loans the Social Row Entities held with S&T, S&T has a first-priority security interest in the accounts receivable and all proceeds thereof, including the funds transferred to the Defendants.

203.    At all times relevant hereto, S&T has therefore been entitled to immediate possession of the accounts receivable collected and transferred to the Defendants.

204.    The Defendants had actual or constructive knowledge of the described contracts and that S&T had a perfected first-priority security interest in the accounts receivable, all by virtue of, among other things, S&T's Uniform Commercial Code financing statements filed of record with the Ohio Secretary of State.

205.    Notwithstanding that knowledge, the Defendants unlawfully interfered with the S&T loan it held with the Social Row Entities by proceeding to collect more than $73 million on account receivables allegedly purchased from the Social Row Entities, which are collateral subject to S&T's first-priority security interest.

206.    The Defendants' actions were intentionally designed to procure the Social Row Entities' breach of their obligations under the security agreements/contracts described above.

207.    The Defendants' actions described herein were taken without justification.

208.    As a result of the foregoing, S&T has been damaged in an amount equal to the full extent of S&T's collateral which has been wrongfully collected and retained by the Defendants in contravention of the S&T loan it held with the Social Row Entities, but in excess of $58 million.

44

WHEREFORE, Plaintiff S&T prays for the following judgment:

A.  Damages in an amount to be proven at trial, but in excess of $58 million, plus interest, attorney fees, treble damages, and punitive damages;

B.  Any such equitable relief the Court may deem just, including but not limited to restitution for the losses S&T sustained as a result of the kiting scheme and disgorgement for the ill-gotten gains Defendants obtained in the court of the kiting scheme;

C.  For any costs and expenses associated with this civil action; and

D.  Any other relief this Court deems just and equitable.

Dated: July 19, 2021                                Respectfully submitted,


                                                    /s/     **Brian Green**
                                                    _____
                                                    BRIAN GREEN (0063921)
                                                    bgreen@shaperolaw.com
                                                    SHAPERO & GREEN LLC
                                                    Signature Square II, Suite 220
                                                    25101 Chagrin Blvd.
                                                    Beachwood, Ohio 44122
                                                    Phone: (216) 831-5100
                                                    *Attorney for Plaintiff*

P:\Brian\S&T\F&H\MCA\Complaint

45

Douglas A. Magenheim, MD, MBA, FACP
Kellie K. Smith, MD, FACP
Deborah Gerdes, MD



MyDoctor

9050 Montgomery Road          513.631-6963
Suite B                       513.631.1970 Fax
Cincinnati, OH  45242         www.mydoctorllc.com

August 1, 2021

The Honorable Marilyn J. Horan
District Judge
US District Court
Western District of Pennsylvania
Joseph F Weis, Jr., US Courthouse
700 Grant Station
Pittsburgh, PA 15219

Re: Harold Sosna

Dear Judge Horan:

I have cared for Mr. Sosna since 2004, and he has asked me to write a summary letter for him concerning his medical history.  Over the past 17 years I have cared for him for a number of medical issues.

Past medical history:

- Abnormal auditory perception
- acne
- allergic rhinitis
- alopecia
- arthropathy of joint of hand
- colon polyp
- benign neoplasm of skin
- benign prostatic hypertrophy with outflow obstruction
- brachial neuritis
- cervical radiculopathy
- depressive disorder
- diffuse spasm of esophagus
- disorder of rotator cuff
- disorder of sulfur-bearing amino acid metabolism
- dysplasia of colon
- essential hypertension
- gastro-esophageal reflux disease with esophagitis
- homocystinemia
- hyperlipidemia
- hypothyroidism
- long-term drug therapy
- lower urinary tract symptoms
- plantar wart of left foot
- postgastric surgery syndrome

- Type 2 diabetes mellitus without complication
- urinary tract obstruction
- varicose veins of lower extremity
- verruca plantaris
- vitamin B deficiency
- vitamin D deficiency

His current medication list is:
alprazolam 0.25 mg tablet – 1 tablet twice daily as needed.
aspirin 81 mg tablet, delayed release - 1 tablet every day by oral route in the morning.
azelastine 205.5 mcg (0.15 %) nasal spray – Two sprays in each nostril twice daily as needed.
bupropion HCl XL 300 mg 24 hr tablet, extended release - 1 tablet daily.
celecoxib 200 mg capsule - 1 capsule by mouth daily.
cetirizine 10 mg tablet - 1 tablet every day by oral route as needed for 30 days.
cholecalciferol (vitamin D3) 50 mcg capsule - 1 capsule every day by oral route in the evening.
coenzyme Q10 100 mg capsule - 1 capsule every day by oral route in the evening.
Daily Multi-Vitamin Tablet - 1 tablet every day by oral route in the evening.
finasteride 5 mg - 1 tablet by mouth daily.
Jardiance 10 mg tablet - 1 tablet by mouth every morning.
levothyroxine 25 mcg tablet - 1 tablet every day by oral route in the morning for 30 days. minocycline 100 mg capsule - 1 capsule by mouth daily.
pantoprazole 40 mg tablet, delayed release - 1 tablet every day by oral route in the morning.
quetiapine 50 mg tablet - 1 tablet by mouth every evening.
rosuvastatin 10 mg tablet - 1 tablet every day by oral route.
sertraline 100 mg tablet -1 Tablet daily.

Harold has been very compliant with his medications and treatment plan for his issues, and those routines have yielded good medical results with treatment goals being met for his mood, cholesterol and diabetes.

He and his counsel have asked me to comment on home confinement from a medical standpoint. While I am not able to comment on the legal and social ramifications of his case. Given his history of good control and compliance with his current and previous treatment plans, continuing his current treatments in his current/self-care home situation would predict continued good control. Given recent issues with the COVID-19 pandemic and spread in congregant living situations, a move to that living situation would increase his risk poor outcome should he contract the virus given his risk factors (age, male, diabetes).

Thank you for your attention to my patient's medical conditions and situation.

Sincerely,

Douglas A Magernheim, MD



EXHIBIT C

Integration of Knowledge and Resources for Occupational Needs

To whom it may concern,

Harold Sosna has been engaged in counseling services at IKRON since December 29, 2020. In treatment he has been addressing the following areas: anxiety, loss and guilt, and alcohol use. Mr. Sosna has engaged well in treatment. He noted progress in coping with difficult emotions and expressed an increase in self-awareness. In treatment, Mr. Sosna expressed remorse and taking full responsibility for past actions. He reported planning for the future in the hopes of finding gainful employment to make restitution to his victims. Mr. Sosna was consistent in attendance and was on time to sessions. He was motivated to and continued to meet Pretrial supervision requirements. Outside of counseling sessions, he began attending Alcoholics Anonymous to specifically address alcohol use.

Mr. Sosna would likely benefit from further mental health support to continue to address anxiety, guilt, and impending life transitions. He would also likely benefit from alcohol use services to address his current use.

Sincerely,

_m ntvPc_

Rachel Eklund, MA, LPC
8-10-21

2347 Vine Street Cincinnati, Ohio 45219 ph (513) 621-1117 Fax (513) 621-2350 ikron@ikron.org
funded in part by the Hamilton County Mental Health and Recovery Services Board,
Opportunities for Ohioans with Disabilities and the City of Cincinnati